UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
───────────────────────────────

ANGEL MATEO, 99-B-0067

             Petitioner,

       -v-                                 05-CV-0206(MAT)
                                           **ORDER**

DALE ARTUS, Superintendent of
Clinton Correctional Facility

             Respondent.
───────────────────────────────


I.  **Introduction**

    Petitioner Angel Mateo ("petitioner") filed this petition for
a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging
two convictions in Monroe County Court before Judge John Connell.[1]

    Petitioner was first found guilty by a jury of Murder in the
First Degree (N.Y. Penal Law § 125.27(1)(a)(vii)), as well as
various counts of Kidnapping in the Second Degree, Kidnapping in
the First Degree, Criminal Possession of a Weapon in the Third
Degree, Murder in the Second Degree, Attempted Murder in the First
Degree, Burglary in the First Degree, and Assault in the First
Degree.  He was sentenced to death for the first-degree murder

---

[1] It is procedurally proper for petitioner to raise his challenge to the
capital and non-capital conviction in a single § 2254 petition. See 28 U.S.C.
§ 2254, Rule 2(e) Governing § 2254 Habeas Proceedings (West 2009); Former
Rule 2(d) Advisory Committee Notes 1976 ("[A] single petition may assert a
claim only against the judgment or judgments of a single court (i.e., a court
of the same county or judicial district or circuit). This permits, but does
not require, an attack in a single petition on judgments based upon separate
indictments or on separate counts even though sentences were imposed on
separate days by the same court.")

conviction and a total of 128 ½ years imprisonment for the remaining counts. This conviction is hereinafter referred to as "the capital case".

On November 8, 1999, petitioner was again found guilty by a jury of five counts of Murder in the Second Degree (Penal Law § 125.25(1),(3)) ("the non-capital case"). For that conviction he was sentenced to 25-years-to-life, consecutive as to each of the three victims for a total of 75 years.

For the reasons that follow, the Court finds that petitioner is not entitled to habeas relief.

## II.  Factual Background and Procedural History

Between August 6, 1995 and November 2, 1996, petitioner and various accomplices engaged in a crime spree involving kidnappings, assaults, burglaries, and four murders in the City of Rochester that resulted in two separate trials in Monroe County Court.[2] The string of attacks relating to the capital case was, according to petitioner, part of an obsessive quest to locate his estranged girlfriend Cindia Janette Sanchez ("Janette"), who left him after months of brutal treatment and took refuge in a women's shelter. With the help of his brother ("Victor") and his wife ("Monica")

---

[2] Petitioner was originally charged in a 22-count indictment including three counts of Murder in the First Degree. Two of those counts charged petitioner with first degree murder on a serial killer theory, which were eventually dismissed by the state court. The remaining count of first degree murder, as well as charges of  attempted murder, second degree murder, kidnapping, criminal possession of a weapon, burglary, and assault, were severed from the indictment and were the subject of a capital trial held over a period of two years in Monroe County Court. Three of the murders were unrelated to the other charges and petitioner was accordingly tried separately.

petitioner conducted a month-long pursuit of Janette that left a bloody trial in its wake.

## A.    The Non-Capital Case

### 1.    The murders of Johvanny Diaz and Joangel Toro

During the early morning hours of August 6, 1995, Johvanny Diaz ("Johvanny") and an acquaintance, Joangel Toro ("Joangel") were killed in a hail of bullets on Jay Street in the City of Rochester by petitioner and his cousin, Romancito Carrion, a.k.a. "Moncho". T. 1205.[3] In his statement to police, petitioner claimed that he and his cousin had been hired by a drug dealer (whom Johvanny was in debt to) to shoot the victim in his kneecaps and steal his jewelry, in order to "embarrass" him. T. 1204-05.

That night, petitioner and Moncho went to the area of Jay Street in Rochester in search of Johvanny Diaz, asking several people where they could find him. At about 2:00 or 3:00a.m. they saw Johvanny drive up to his house, park his car, and walk up the driveway. Joangel Toro had earlier been approached by the two men regarding Johvanny's whereabouts. Joangel ran to Johvanny in the driveway and informed Johvanny about the inquiries. Changing their plans, petitioner and Moncho first decided to ask Johvanny for an eight-ball of cocaine. Johvanny said that he didn't have it, and continued to walk to a pay phone across Jay Street with Joangel following. T. 1206-07.

---

[3] Citations to "T.__" refer to the transcript non-capital trial.

Petitioner and Moncho approached the two men at the pay phone, pulled nylon masks over their faces, and drew their guns. While Johvanny was using the pay phone, petitioner grabbed Joangel, who was frightened, and told him to "calm down". Moncho started talking to Johvanny, and when petitioner lifted his mask away from his face, he heard "the first boom." The first shot hit Johvanny in the face, and Moncho continued to shoot. Petitioner also started shooting, but could not recall how many rounds he fired. The petitioner and Moncho then ran down the street, jumped a fence, and met a friend who drove them to a motel, where they stayed until the next morning. The medical examiner who performed the autopsy testified at trial that Johvanny and Joangel died of multiple gunshot wounds. Johvanny was shot in the forehead, eye, neck, shoulder, and abdomen; Joangel was shot in the hip and back. The two were shot a total of 11 times. T. 872-928, 1207-08, 1231-33.

### 2. The murder of Peter Holley

On September 22, 1995, petitioner was at his cousin Jimmy Mateo's house when Jimmy told petitioner that a "black guy over near Jones Park" had robbed him of his bicycle and jewelry. Petitioner found his aunt's .12 gauge shotgun and he and Jimmy drove around the neighborhood until they spotted the bicycle standing on its kickstand at the corner of Fulton Street. Nearby, a man was walking toward Lake Avenue, who Jimmy identified as the thief. As the man approached a car and got inside, petitioner

pulled up alongside him and shot him in the head through the passenger-side window of his vehicle. Petitioner then drove away and parked on Saratoga Street, where he left the car and the shotgun. When asked by investigators whether petitioner knew he had killed Peter Holley when he shot him, petitioner smiled and replied, "What the fuck do you think when you shoot someone in the head with a shotgun[?]" T. 1213-15, 1233-35, 1377.

**B. The Capital Case**

**1. The hostage incident on Avenue D**

The next incident occurred on October 11, 1996, when petitioner and Monica forced their way into an apartment on Avenue D in Rochester, which was occupied by Janette's sister ("Maria"), her boyfriend ("Jose"), and her four-year old daughter ("Leila"). Wielding a .357 caliber handgun, petitioner pointed the gun at Jose, threatening to kill him and everyone else in the house. Monica provided petitioner with a set of handcuffs, which he placed on Jose and ordered the man to lie on the floor. Monica brought sheets from the bedroom and covered the windows. When Leila began to cry, petitioner hit her on the head with the gun. Petitioner then demanded that Maria call her sister at the shelter, and made repeated threats to kill Maria, Jose, and Leila. After multiple attempts, Maria was finally able to get through to Janette at the

women's shelter. Petitioner took the phone away and made arrangements to meet with her. R. 14959-60, 14971-75, 15100-107.[4]

As Janette recalled, "he was telling me he wanted to talk to me because he wanted to fix everything with me." Monica, meanwhile, sat passively while petitioner pleaded with Janette on the telephone. Maria and Leila remained in the apartment, crying and scared. Petitioner confided in Jose that he always wanted to kill Maria for being "in his business," but, he said, "it's not my style to come in homes and kill families. I only do that kind of shit in the street." Over three hours after the incident began, petitioner and Monica left the apartment with no one seriously harmed. Although Jose later called the police, Janette "begged" him not to press charges out of fear of retaliation by petitioner. R. 14928, 14933, 14975-81, 14983-84, 14989-90, 15106-09.

Petitioner, determined not to give up on his pursuit of Janette, attempted multiple times to contact her through Maria or encounter her on the street, and left her numerous messages at the women's shelter about his desire to talk to her and "fix everything." Although petitioner was legally married to Monica, he admitted to Rochester Police Investigator Terrance Sheridan ("Sheridan") that he was deeply in love with Janette and that living with her was the "greatest times of his life." In his quest for Janette, petitioner began "searching the city trying to find

_____

[4] Citations to "R.__" refer to the Record on Appeal of the capital case, which includes trial minutes.

her and," as he later put it, "would hurt anyone that got in his way." R. 14650-51, 14927-33, 15113-14.

### 2. The kidnapping and murder of Juan Rodriguez-Matos

Juan Rodriguez-Matos ("Juan") was a 20-year old mentally ill individual with a fleeting connection to Janette Sanchez. Petitioner ultimately signed a confession, typed verbatim as he narrated the events to Rochester Police investigators, detailing how his search for his "girlfriend" led to Juan's murder.

On November 2, 1996, petitioner, Monica, and Victor were driving around the city looking for Janette. As they turned onto Smith Street, petitioner saw a "dude that knows a friend of [Janette]." Monica, who was driving, stopped the car on Jay Street, where petitioner got out and approached Juan. Petitioner asked Juan about his friend and where she could be found. "He was acting funny. He was saying that he knew where she lived at but couldn't give me the address. He knew it but didn't want to tell. I pulled out my little .25 semiautomatic gun and ordered him into the car." Petitioner directed Monica to drive them to petitioner's house on Saxton Street. Once inside, petitioner began to inquire about where this friend of his lived. Juan finally acquiesced, stating that he didn't want to be involved or get his friend into trouble. Petitioner handcuffed Juan and walked him down to the basement. According to petitioner, "I had already made up my mind that I was going to kill him."

Petitioner put a dark handkerchief over Juan's eyes and shot him in the head. Juan apparently did not die immediately, so petitioner put a plastic garbage bag over his head. A few hours later, petitioner checked to confirm that Juan was dead. Petitioner and Monica wrapped the body in some curtains and other items and the three (including Victor) rode to Sherer Street to dispose of the body. Petitioner's confession concluded with the following statement: "Everything [Monica and Victor] did was from out of fear of me and what I would do to them. If Monica is taking the blame for this it's because it's out of fear of me. I think I should get the death penalty for the things I did." R. 14662-70, 14683-88, 14699-702.

Juan's body was later found in an empty lot at the end of Sherer Street near the Rochester Aluminum Smelting Company. Consistent with the confession, a dark-colored bandana was tied over the victim's eyes and, over it, a plastic bag encased his head. The body was wrapped in a blanket and a curtain. Dr. Thomas Smith, Deputy Medical Examiner for Monroe County, ascertained that death had been caused by a single bullet, likely from a small caliber firearm, through the head. In addition to other physical evidence, bloodstains on the basement floor of petitioner's apartment matched Juan Matos's blood type, and that of only six in 10,000 Hispanics. R. 15110-14, 15452-62, 15486-88, 15520-30, 15784-90.

Although petitioner said from the outset that it was he who shot Juan, he also verbally described to investigators how he was able to get Monica and Victor to do his bidding, and at one point said that Monica pulled the trigger: "She is a crazy bitch. Shot the guy." He further claimed that he was at the top of the stairs when Monica killed Juan, but said that he would take the blame for it and would adhere to his original version of the story in the statement he'd give police. Among his various confessions to investigators, petitioner wavered on the details of the killing, at one point saying that he placed the gun in Monica's hand and was "headed for the stairs" when she pulled the trigger. Regardless of which of the confessions is to be credited, petitioner made the ultimate decision to take the victim into the basement ane execute him. R. 14653-59.

### 3.    The return to Avenue D

On November 6, three days after dumping Juan Matos's body on Sherer Street, petitioner, Monica, and Victor returned to the apartment of Maria Sanchez, anticipating that her sister Janette would turn up. After waiting several hours in the basement of the Avenue D apartment, petitioner grew impatient and decided that they should take over the first floor apartment and wait there. R. 15190-200.

Willie McWilliams ("McWilliams") occupied the first-floor apartment on Avenue D with his girlfriend and five-year-old son.

When McWilliams answered a knock on his back door, he was greeted by a large-caliber automatic gun pointed at his head. Petitioner announced that McWilliams was "under arrest." Monica, who was carrying a smaller firearm and Victor, who was not armed, followed petitioner inside. Petitioner hit McWilliams in the head with his weapon and forced him to the floor, instructing Victor to handcuff him. Petitioner then put one foot on the back of McWilliams's neck and pulled his head back to expose his throat to the blade of a knife that had been taken from the kitchen. The first slash was diverted, apparently by a necklace the victim was wearing, so petitioner cut McWilliams a second time from ear to ear. Anticipating that he was soon going to die, McWilliams, still handcuffed, reared up and "head-butted" petitioner. At this point petitioner withdrew and headed toward the living room, but McWilliams pursued him. The handcuffs had eventually came loose, and petitioner fired multiple shots while McWilliams charged at petitioner. Monica, meanwhile, pointed her gun at McWilliams's son, Q.J., but had problems firing the gun due to the gloves she was wearing. McWilliams's girlfriend had since escaped the house to call 911. When petitioner heard the sound of approaching sirens, he fled, leaving Monica to struggle with McWilliams. R. 14269-73, 14277-80, 14351,15191-201.

Despite being shot, McWilliams succeeded in knocking over Monica, who turned the gun on herself, lamenting that she and her

companions "hit the wrong apartment." She asked McWilliams to kill her: "You already took my husband out," (petitioner was ultimately found to have suffered a minor gunshot wound in the exchange). McWilliams, who was seriously wounded and still thinking he was going to die, refused and insisted that she remain alive to bear witness.[5] Monica handed the gun over to five-year-old Q.J., asking the child to shoot her, and McWilliams again intervened. Moments later, police arrived and apprehended Monica. R. 14280-84, 14383, 15800.

## C. Petitioner's Arrest and Interrogation

After questioning Monica, Rochester police contacted security personnel at Marine Midland bank and asked to be notified if petitioner showed up. At approximately 4:45p.m., petitioner arrived in the passenger seat of a car as it drove up to the teller window at the Lyell Avenue branch. The vehicle was driven by his mother, and in the back seat were Victor and two other men variously described as half-brothers or cousins. Rochester police convened at the bank and ordered everyone out of the car. As petitioner complied, a cream-colored pistol fell from his waist. The .380 caliber semi-automatic gun was later found to have fired three of the bullets found at McWilliams home on Avenue D. R. 14519-22, ,

---

[5] In addition to having his throat cut, McWilliams sustained stab wounds to his jaw, gunshot wounds to his shoulder, back, and foot, and his teeth were knocked out during the skirmish. R. 14352-56.

14526-30, 14549-55, 14562-64, 14578, 14580-85, 14825, 15256-57, 15293, 15738-39.

Petitioner was taken to the Rochester Public Safety Building to await investigators. Before any investigators arrived, he announced to the officer guarding him, "Give me the D.A. and I'll tell him everything. I only want to talk with the head man." Investigator Sheridan and Sergeant John Gropp ("Gropp") walked into the interview room at approximately 5:45pm and introduced themselves. Petitioner initially demanded that his family be released before he would discuss any of the crimes. Sheridan responded that he would first have to know more about what crimes petitioner was offering to discuss. Sheridan then read petitioner his Miranda rights, which petitioner waived. R. 14635-42, 14820-21, 15026.

After approximately 45 minutes, petitioner offered to discuss Johvanny, a name that Sheridan recognized. Sheridan knew that a man named Joangel Toro was killed along with Johvanny Diaz, so he asked petitioner whether he was responsible for killing Johvanny. Petitioner answered "yes," and said that he would talk about it, along with "some others" but again insisted that his family be released. Sheridan ignored petitioner's request, and continued to question him regarding the other homicides. Petitioner eventually told Sheridan that he killed a man near a milk plant on Lake Avenue, and another person on Sherer Street. Although petitioner

still wanted "something for his family in return," for this information, investigators promised him nothing. R. 14821-24.

Sheridan noticed that petitioner had a limp and was wearing a white gauze bandage on his leg. Petitioner attributed the injury to the incident at the Avenue D apartment earlier that morning, but did not describe the event in detail. Sheridan asked if petitioner wanted to have the wound treated at the hospital, but petitioner denied the offer and stated that he "want[ed] to get this cleared up." R. 14643-47.

Sheridan and Gropp left the interview room for about thirty minutes, and returned to inform petitioner that everyone who was arrested at Marine Midland bank faced charges for the gun that was recovered at the scene of the arrest. Petitioner insisted that the others were not responsible, the gun was his alone, and repeated that he wanted his family released. Sheridan then pointed out that Monica had been arrested at the apartment of Willie McWilliams earlier in the day and was facing very serious charges and "wasn't going anywhere." Petitioner then became "very upset" after learning the police had reason to believe that Victor was also involved in the incident. He angrily asserted that only petitioner and Monica entered the apartment armed with guns, and that Victor merely waited outside until after the shooting, at which point he "came in only to aid [petitioner]." Sheridan advised petitioner that although Monica and Victor were not going to be released, the rest

of his family would not be charged with possession of the gun: "[W]e have met your demands, so to speak; start at the beginning and tell us those homicides." Petitioner began to discuss the four murders. R. 14826-28, 14830-31.

Petitioner discussed the killing of Johvanny Diaz, and related that he and another man, whom he eventually acknowledged as his cousin Moncho, were hired by a drug dealer to shoot Johvanny in the knees and take his money. Johvanny was in debt to the drug dealer, who contracted petitioner and Moncho to "embarrass" Johvanny, but not kill him. Petitioner acknowledged that the pair "changed the plan a little bit." After Johvanny refused to sell them cocaine, petitioner and Moncho confronted Johvanny and his companion, Joangel, at a pay phone. Petitioner grew frustrated trying to breathe behind the nylon mask so he pulled it off. As he did so, Moncho shot Johvanny in the face. When Joangel looked toward petitioner, he started shooting too. "The booms kept coming" and soon both victims were left dead or dying from multiple gunshot wounds. R. 14831-36, 14851-53.

Petitioner then turned to the killing of Peter Holley, who was shot near a milk plant. The murder occurred after Jimmy Mateo was robbed of a bicycle and gold chain "by a black dude who had a knife." Petitioner thereupon retrieved his aunt's .12 gauge shotgun and he and Jimmy drove around the neighborhood until they spotted the bicycle on a street corner. Nearby, a man was starting to get

into a car. Jimmy identified the thief, and petitioner told the investigator that "I shot him in the head." R. 14836-37, 14855-56.

Next petitioner gruesomely described the kidnapping and murder of Juan Rodriguez-Matos to investigators, proclaiming that he "wanted the death penalty" for the crime because "I'm a king and I can't do a hundred years in jail." Before he would consent to signing the typed version of any of the confessions, he insisted on calling his mother to confirm that she had been released. Investigators made arrangements for that phone call, and the confessions were subsequently typed and signed. R. 14645-76, 14838, 14848-49.

Finally, at approximately 1:35a.m., Gropp questioned petitioner and obtained similarly explicit confessions about the two incidents at Avenue D, including the one earlier that day involving McWilliams. Aside from noting his leg injury was sustained while grappling with McWilliams, ("I felt something hit me in the right leg. I don't know if Monica shot or what") the only thing that his confession added to McWilliams testimony was the acknowledgment that this hostage-taking was the product of his desire to "find my girlfriend . . or find out if they could get here there." He professed, "All this shit over the love of a woman." R. 14849, 15189-200, 15211.

### D.   Petitioner's Appeals

The capital case and attendant convictions were appealed directly to the New York Court of Appeals, which affirmed the conviction but reversed the sentence of death.[6] People v. Mateo, 2 N.Y.3d 383, cert. denied 542 U.S. 946 (2004); see Appx. E. Petitioner was re-sentenced on his first degree murder conviction on August 18, 2004, to life imprisonment without parole. See Resp't Answer ¶ 7. (Docket No. 4).  On September 9, 2004, petitioner's attorney filed a Notice of Appeal from the judgment of conviction and the sentence, and that appeal is still pending in state court. See Resp't Answer ¶ 9; Appx. G. Despite the inclusive language in petitioner's Notice,  further appeal lies only from the re-sentence and not from any alleged errors committed at or before trial. See, e.g. People v. Ryder, 239 A.D.2d 364 (2d Dept. 1997) lv. denied, 90 N.Y.2d 910. As such, petitioner's conviction is final for purposes of habeas review, and the issues raised in the instant petition are unrelated to the re-sentencing.

Petitioner's non-capital case was appealed to the Appellate Division, Fourth Department, which affirmed all convictions. People v. Mateo, 11 A.D.3d 984 (4th Dept. 2004); Appx. L. Leave to appeal this decision was denied by the New York Court of Appeals. 3 N.Y.3d 758 (2004).

---

[6] Citing its previous decisions in Hynes v. Tomei, 92 N.Y.2d 613 (1998) and People v. Harris, 98 N.Y.2d 452 (2002) holding New York's death penalty statute unconstitutional,  the Court of Appeals struck the death notice and limited petitioner's sentence to life without parole upon re-conviction.

## III. Discussion

### A. General Principles Applicable to Federal Habeas Review

#### 1. Standard of Review

To prevail under 28 U.S.C. § 2254, as amended in 1996, a petitioner seeking federal review of his conviction must demonstrate that the state court's adjudication of his federal constitutional claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual determination in light of the evidence presented in state court. See 28 U.S.C. § 2254(d)(1), (2); Williams v. Taylor, 529 U.S. 362, 375-76 (2000).

A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner to the facts of a particular case. Williams, 529 U.S. at 413. The inquiry for a federal habeas court is not whether the state court's application of the governing law was erroneous or incorrect, but rather whether it was "objectively unreasonable." See id. at 408-10; see also Eze v. Senkowski, 321 F.3d 110, 125 (2d Cir. 2003). Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and

convincing evidence." 28 U.S.C. § 2254(e)(1); <u>see also</u> <u>Parsad v.</u>
<u>Greiner</u>, 337 F.3d 175, 181 (2d Cir.) ("The presumption of
correctness is particularly important when reviewing the trial
court's assessment of witness credibility."), <u>cert. denied sub nom.</u>
<u>Parsad v. Fischer,</u> 540 U.S. 1091 (2003).

### 2. Exhaustion Requirement and Procedural Bar

"An application for a writ of habeas corpus on behalf of a
person in custody pursuant to a judgment of a State court shall not
be granted unless it appears that . . . the applicant has exhausted
the remedies available in the courts of the State . . . ." 28
U.S.C. § 2254(b)(1)(A); <u>see, e.g.,</u> <u>O'Sullivan v. Boerckel</u>, 526 U.S.
838, 843-44 (1999); <u>accord, e.g.,</u> <u>Bossett v. Walker</u>, 41 F.3d 825,
828 (2d Cir. 1994), <u>cert. denied</u>, 514 U.S. 1054 (1995). "The
exhaustion requirement is not satisfied unless the federal claim
has been 'fairly presented' to the state courts." <u>Daye v. Attorney</u>
<u>General</u>, 696 F.2d 186, 191 (2d Cir. 1982) (<em>en banc</em>), <u>cert. denied</u>,
464 U.S. 1048 (1984). "The exhaustion requirement is principally
designed to protect the state courts' role in the enforcement of
federal law and prevent disruption of state judicial proceedings,
and is not satisfied unless the federal claim has been 'fairly
presented' to the state courts." <u>Jimenez v. Walker</u>, 458 F.3d 130,
148-149 (2d Cir. 2006) (internal citations and quotation marks
omitted).

"For exhaustion purposes, a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred." Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997) (quotations omitted). "In such a case, a petitioner no longer has 'remedies available in the courts of the State' within the meaning of 28 U.S.C. § 2254(b)." Grey v. Hoke, 933 F.2d 117, 120 (2d Cir. 1991). Consequently, such procedurally barred claims are "deemed exhausted" by the federal courts. E.g., Grey, 933 F.2d at 120-21; Reyes v. Keane, 118 F.3d at 139.

For a procedurally defaulted claim to be heard on habeas review, "the petitioner must show cause for the default and prejudice, or demonstrate that failure to consider the claim will result in a miscarriage of justice (i.e., the petitioner is actually innocent)." Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001) (citing Coleman v. Thompson, 501 U.S. 722, 748-50 (1991)).

B.    **Merits of the Petition**

1.    **Involuntary Confession**

Petitioner claims, as to both cases, that his confessions were involuntary, induced by police promises that his family would be released and charges against his brother would be "limited to minor offenses". Pet. ¶ 12(a). (Docket No. 1). This is his sole claim for habeas relief. He raised the issue in his direct appeal from the capital conviction. In that case, the Court of Appeals

determined: "On this record, there is no evidence that defendant's will was overborne or his capacity for self-determination impaired, and every indication that he spontaneously, aggressively and voluntarily confessed to suit his own purposes." <u>People v. Mateo</u>, 2 N.Y.3d 383, 416 (2004); Appx. E.

Respondent contends that the voluntariness issue was not raised on the non-capital appeal and is thus unexhausted and procedurally defaulted. In a letter to the Appellate Division, petitioner's appellate counsel requested that the court preserve the issue for the purpose of future federal litigation, but acknowledged he did not brief the claim on appeal.[7] <u>See</u> Pet'r Reply, Ex. A. (Docket No. 7). The Appellate Division held that the issue was not timely raised, and that in any event, was without merit. <u>People v. Mateo</u>, 11 A.D.3d 984 (4th Dept. 2004). The claim was also not raised to the New York Court of Appeals, <u>see</u>, Appx. M, and the Court agrees that the claim is therefore unexhausted.

With respect to the non-capital conviction, petitioner's unexhausted claim is procedurally defaulted because petitioner has already used the one direct appeal to which he is entitled under New York state law, and if he were to raise the claim in a N.Y. Crim. Proc. Law § 440.10 motion to vacate the judgment, it would be

---

[7] In his letter, appellate counsel explained that he did not brief the voluntariness issue because the Court of Appeals decision would require the Appellate Division to reject it. Nevertheless, petitioner wished to preserve his right to seek federal habeas relief on the voluntariness of the confession. Pet'r Reply, Ex. A.

dismissed because it should have been raised on direct appeal. See N.Y. Crim. Proc. Law § 440.10(2)(c); N.Y. Court Rules § 500.10(a); Grey v. Hoke, 933 F.2d 117, 119-21 (2d Cir. 1991). Petitioner has not demonstrated cause and prejudice to excuse the default, or that a fundamental miscarriage of justice would occur should this habeas court decline to review the claim. Nevertheless, petitioner is still entitled to a merits review of his voluntariness claim pertaining to his capital case because it has been properly exhausted, and, in any event, the claim arises out of a single interrogation and evidentiary hearing, and requires the same analysis regardless of which conviction it attaches to.

The "ultimate issue of voluntariness [of a confession] is a legal question requiring independent federal determination." Nelson v. Walker, 121 F.3d 828, 833 (2d Cir. 1997) (quoting Arizona v. Fulminante, 499 U.S. 279, 287 (1991)); see also Nova v. Bartlett, 211 F.3d 705, 707 (2d Cir. 2000). "'No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances.'" Nelson, 121 F.3d at 833 (quoting Green v. Scully, 850 F.2d 894, 901 (2d Cir.), cert. denied, 488 U.S. 945 (1988)). Factors to be considered include the accused's experience and education; the conditions of the interrogation; and the conduct of law enforcement officials, notably, whether there was physical abuse, the period of

restraint in handcuffs, and use of psychologically coercive tactics. Id. (citing Green, 850 F.2d at 901). "'[S]ubsidiary questions, such as the length and circumstances of [an] interrogation,'" or whether "'the police engaged in the intimidation tactics alleged by the defendant,' are entitled to the presumption of correctness." Id. (quoting Miller v. Fenton, 474 U.S. 104, 112, 117 (1985)); see also Towndrow v. Kelly, 2000 WL 33743385, at *4 (N.D.N.Y. Dec. 20, 2000) (factual findings relevant to the voluntariness of a habeas petitioner's confession made by the state court are entitled to the presumption of correctness, and a petitioner must rebut this presumption by clear and convincing evidence) (citing 28 U.S.C. § 2254(e)(1)).

A full evidentiary hearing was held before the trial court concerning the issue of voluntariness. R. 8576-9055. Following that hearing, the court made the following determinations:

> [D]efendant was properly advised of his Miranda warnings and made a knowing, voluntary and intelligent waiver of those warnings before speaking with the officers. During the ensuing hours of interviews, the defendant made numerous inculpatory, spontaneous, oral and written statements to the police concerning the events under investigation. There is no evidence that the police in any way coerced statements made by the defendant, nor induced them by any threats or promises, implied or otherwise, concerning either the charges in this case against the defendant or charges, real or imagined, against his family. The People met their burden in establishing the voluntariness of the statements of the defendant.

R. 17307.

On appeal, the Court of Appeals analyzed the issue in light of the Supreme Court's decisions in Arizona v. Fulimante, 499 U.S. 279 (1991) and Colorado v. Connelly, 479 U.S. 157 (1986)[8], and found ample evidentiary support for the hearing court's factual findings: "A review of the circumstances here, moreover, shows that the [petitioner's] confession was voluntary, and that coercive police activity did not occur." Mateo, 2 N.Y.3d at 414. This Court agrees.

Petitioner initially expressed his willingness to discuss the crimes when he demanded to speak "with the head man," referring to the District Attorney. A few minutes later, petitioner shouted to an investigator walking down the hall to send in the detective handling his case while he still felt like talking. As a result, investigators arrived and read petitioner his Miranda rights, which he waived. Although he insisted that his family be released as precondition to discussing the homicides, petitioner immediately began talking, starting with Johvanny. Petitioner repeated again that he wanted his family released, but went on to admit that he killed "a black guy near the milk plant" [Peter Holley] and then acknowledged that he had also killed Juan Matos. The record indicates that at no time did the investigators promise that Victor

---

[8] Fulminante requires that the voluntariness of a confession must be reviewed in totality of the circumstances. 499 U.S. at 285-86. In Connelly, the Supreme Court held that coercive police activity if a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause. 479 U.S. at 167.

or petitioner's other family members would receive leniency or be released. In fact, Sheridan specifically indicated to petitioner that Victor would *not* be released due to the nature of the crimes he was thought to be involved in. After petitioner submitted that the gun recovered at the scene of the arrest belonged to him, Sheridan informed petitioner that his relatives (those arrested at Marine Midland bank) had been released. Contrary to petitioner's assertion, this does not amount to a *quid pro quo* and it does not render involuntary petitioner's subsequent elaboration about the murders.

"As is obvious from the exchanges, [petitioner] believed that he was in a position to influence the release of his family, acting under a self-created impulse to tell the police "everything" in order to achieve his own objective." Mateo, 2 N.Y.3d at 415. Petitioner's proclamation of being "a king" and his desire for the death penalty supports the state court's conclusion that he freely and vociferously rendered his confessions. Even if the Court were to believe that investigators allusively promised petitioner anything, such conduct, standing alone, does not render a confession involuntary. See Green v. Scully, 850 F.2d 894, 901 (2d Cir. 1988) ("[T]he presence of a direct or implied promise of help or leniency alone has not barred the admission of a confession where the totality of the circumstances indicates it was the product of a free and independent decision."); see also Connelly,

479 U.S. at 164 n.2 ("Even where there is causal connection between police misconduct and a defendant's confession, it does not automatically follow that there has been a violation of the Due Process Clause.")

Moreover, petitioner does not allege physical abuse or misconduct by the investigators. He was offered food, cigarettes, water, and medical treatment. He was allowed meetings with Monica and Victor, and was permitted a phone call to his mother as per his requests to the police. It is clear from the record that the investigators' conduct was not coercive and did not suppress petitioner's free will. The New York Court of Appeals thus did not unreasonably apply or render a decision contrary to <u>Fulminante</u> and <u>Connelly</u>. Because habeas relief does not lie for this ground, the petition for habeas corpus is denied and the action is dismissed.

## IV. Conclusion

For the reasons stated above, Angel Mateo's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because the petitioner has failed to make a "substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability. <u>See, e.g.</u> <u>Lucidore v. New York State Div. of Parole</u>, 209 F.3d 107, 111-113 (2d Cir. 2000). The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies

leave to appeal as a poor person.  <u>Coppedge v. United States</u>, 369

U.S. 438 (1962).


       **SO ORDERED.**

                        S/Michael A. Telesca

                 _____
                       MICHAEL A. TELESCA
                  United States District Judge

Dated:_October 9, 2009
       Rochester, New York